## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

DARYL L. BURT,

                    **Plaintiff,**

      vs.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

                  **Defendant.**

**CASE NO.  8:13CV267**

**MEMORANDUM
AND ORDER**

Daryl L. Burt filed a complaint on August 26, 2013, against Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration. (ECF No. 1.)  Burt seeks a review of the Commissioner's decision to deny his application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. The defendant has responded to Burt's complaint by filing an answer and a transcript of the administrative record.  (See ECF Nos. 10, 11).  In addition, pursuant to the order of Senior Judge Warren K. Urbom, dated November 13, 2013 (ECF No. 13), each of the parties has submitted briefs in support of his or her position.  (See generally Pl.'s Br., ECF No. 15; Def.'s Br., ECF No. 20, Pl.'s Reply Br., ECF No. 21). After carefully reviewing these materials, the court finds that the Commissioner's decision must be affirmed.

## I.  PROCEDURAL HISTORY

Burt, who was born on November 22, 1958 (Tr. 245), filed applications for disability insurance benefits and for SSI benefits under Title XVI on June 16, 2010. (Tr.

245-49). He alleged an onset date of March 11, 2010. (Tr. 245). Burt's SSI application was denied on May 27, 2010, because he had too much unearned income from unemployment insurance to be eligible. (Tr. 91, 185-92). He did not appeal from that denial. (Tr. 91). His Title II claim was denied initially (tr. 114-18) and on reconsideration on January 26, 2011. (Tr. 119-26). Burt requested a hearing before an administrative law judge (ALJ) on March 2, 2011. (Tr. 128). On July 13, 2011, Burt filed another Title XVI application for SSI. (280-85). A hearing was held on October 17, 2011. (Tr. 151).

On November 9, 2011, the ALJ found that Burt had not been under a disability from March 11, 2010, through the date of the decision. (Tr. 91-103). Burt sought review by the Appeals Council. (Tr. 194). On January 24, 2012, the Appeals Council remanded the case to an ALJ. (Tr. 109-11). The Appeals Council identified three issues for the ALJ to address: 1) the assessed residual functional capacity (RFC)[1] did not include any corresponding social limitations even though the ALJ found that Burt had moderate limitations in maintaining social functioning; 2) the decision did not include a narrative discussion describing how the evidence supported the RFC assessment; and 3) the decision merely summarized the medical evidence of record but did not evaluate and assess the weight given to medical opinions of record. (Tr. 110). The Appeals Council directed the ALJ to give further consideration to Burt's maximum RFC during the entire period at issue and to provide rationale with specific references to the evidence in support of assessed limitations, including an evaluation of the treating and examining and non-examining source opinions and an explanation of the weight given to the

---

[1]  "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

opinion evidence. If appropriate, the ALJ could request the treating and examining source to provide additional evidence and/or further clarification. (Tr. 111). The Appeals Council also directed the ALJ to obtain supplemental evidence from a vocational expert (VE) to clarify the effect of the assessed limitations on Burt's occupational base. The ALJ was also directed to identify and resolve any conflicts between the occupational evidence provided by the VE and information in the Dictionary of Occupational Titles (DOT). (Tr. 111). A hearing upon remand was held on April 26, 2012. (Tr. 70-83). On May 14, 2012, the ALJ issued a decision, again finding that Burt was not disabled. (Tr. 9-27).

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five.  *See id.* Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.  *See* 20 C.F.R. § 404.1520(a)(4)(i), (b). The ALJ found that Burt had not been engaged in substantial gainful activity since March 11, 2010, the alleged onset date. (Tr. 14).

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing,

3

sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c). The ALJ found that Burt had the following severe impairments: depression not otherwise specified, anxiety disorder, cannabis dependence, degenerative disc disease of the lumbar spine, obesity, and fibromyalgia. (Tr. 14).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ found that Burt did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 15).

Step four requires the ALJ to consider the claimant's RFC to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. §

404.1520(a)(4)(iv), (f). The ALJ found that Burt was unable to perform any past relevant work. (Tr. 25).

At step five, the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. If the claimant is able to do other work, he is not disabled. The ALJ found that Burt had the RFC to perform the full range of medium exertional work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), was able to understand, remember, and carry out four- to five-step instructions, is able to tolerate frequent contact with co-workers and supervisors, and was able to tolerate occasional contact with the public. (Tr. 18). The ALJ found that Burt had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy. (Tr. 26). Therefore, Burt had not been under a disability from March 11, 2010, through the date of the decision. (Tr. 27). The Appeals Council denied further review on July 2, 2013. (Tr. 1-6). Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Burt seeks judicial review.

## II.  FACTUAL BACKGROUND

### A.    Medical Evidence

Burt alleged he was disabled due to interstitial cystitis, fibromyalgia, chronic sinusitis, carpal tunnel in both wrists, pain and numbness in arms, arthritis, deviated septum, allergies, back pain, loss of mobility, scar tissue on penis, spermatocele on left testicle, bladder ulceration, bipolar disorder, high cholesterol, and pain in knees, hips, ankles, and joints. (Tr. 318). In his brief, he focuses on fibromyalgia, carpal tunnel syndrome, and psychiatric disorders. (Pl.'s Br. at 3-4).

The medical records date to January 1999, when Burt began taking Daypro for back pain caused by fibromyalgia. (Tr. 454). He reported marked improvement in a few weeks, although he still had pain. (Tr. 455). His blood work was negative for rheumatoid arthritis. (Tr. 455). K.A. Glab, M.D., recommended that Burt begin physical therapy. Burt complained of depression, and Dr. Glab gave him samples of Paxil. (Tr. 455). In February 1999, Burt reported that Daypro and physical therapy had helped. (Tr. 455).

At a pre-employment physical in November 1999, Burt complained of numbness and tingling in his wrists. (Tr. 446). He was given a splint to wear on his left wrist during the day and nerve conduction studies were planned to determine if he had carpal tunnel syndrome. (Tr. 446).

Burt indicated in his brief that he did not need any specialized treatment for five years. (Pl.'s Br. at 6.) In November 2004, Burt told Trenette Larson, M.D., that he thought he had fibromyalgia. (Tr. 415). He reported daily pain for seven to eight years. He stated that the pain was in the upper and lower back, ankles, shoulders, lateral thighs, lower legs, and left flank. He described the pain as searing and needling. He also reported muscle pain, fatigue, sleep maintenance insomnia, chronic sinusitis, postnasal drainage, frontal and facial headaches, and arthralgias of his ankles. (Tr. 415). Dr. Larson noted that Burt had 16 out of 18 tender points present and assessed that Burt had "Fibromyalgia by ACR [American College of Rheumatology] criteria with associated fatigue, sleep disturbance and headaches." (Tr. 415). However, his fatigue was not severe enough to qualify as chronic fatigue syndrome. Dr. Larson prescribed Tramadol, which was "considered the drug of choice for mild to moderate fibromyalgia

as it is a serotonin and norepinephrine uptake inhibitor and has pain relieving properties as well as antidepressant and stimulant properties.". (Tr. 415).

When Burt returned for a follow-up visit in January 2005, he reported that his pain was better when he took Ultram. Dr. Larson noted that Burt was able to move around better, and he reported that he worked eight hours a day and was able to get his duties done more quickly. (Tr. 414). In April 2005, Dr. Larson noted that Burt's fibromyalgia was well-controlled and his sleep was improved. The treatment notes indicate that nerve conduction studies showed carpal tunnel syndrome in Burt's left wrist, but it was not symptomatic enough to require surgery. (Tr. 413, 449-450).

In July 2005, x-rays showed degenerative changes of Burt's lumbosacral spine without evidence of acute fracture or dislocation. (Tr. 428). In January 2006, Burt reported to Dr. Larson that he had a pins-and-needles sensation in his arms and lower legs when he woke up, but it went away in a few minutes after he started moving. (Tr. 411).  Dr. Larson noted that Burt's fibromyalgia was worse than it had been in the summer months, but it was very well-controlled with lifestyle changes and medications. (Tr. 411).

In December 2006, Dr. Larson noted that Burt reported Lyrica had helped his sharp twangs of pain. (Tr. 409). He said his energy level and sleep were better, but it could take an hour after waking up to become fully functional. (Tr. 409). Burt stated that he no longer took Ultram. (Tr. 409).

Richard Jay, D.O., began treating Burt in April 2008. (Tr. 508). Burt reported that he no longer took Tramadol. (Tr. 508). Dr. Jay diagnosed Burt with otitis media, osteroarthritis, and fibromyalgia. Dr. Jay educated Burt about his medications and

7

condition. (Tr. 509). In October 2008, Dr. Jay noted that Burt's fibromyalgia was controlled with medication. (Tr. 510).

In January 2009, Burt consulted with Oscar Sanchez, M.D., for pain control. (Tr. 494). Dr. Sanchez reported that Burt was independent in his daily living activities and gait and used no assistive devices. Burt claimed he was not able to take a daily shower due to significant drowsiness and fatigue. (Tr. 494). Dr. Sanchez assessed Burt as having chronic pain syndrome with fibromyalgia syndrome which was fairly controlled, pain disorder with other psychological factors, fatigue associated with chronic pain and hypersomnolence, history of carpal tunnel syndrome, and rule out mood disorders.[2] (Tr. 495). Dr. Sanchez stated that it was difficult to keep Burt focused during the examination. Burt did not want to try any narcotics and declined physical therapy. (Tr. 495-96). Dr. Sanchez recommended no changes in medications, but he recommended a psychiatric evaluation because he believed Burt had an underlying mood disorder which needed to be treated. (Tr. 496).

In March 2010, Dr. Jay noted that Burt's fibromyalgia, osteoarthritis, and carpal tunnel syndrome were all unchanged. (Tr. 472, 520). He had a normal gait, balance, and motor. (Tr. 472). Burt was given refills for Cymbalta, Lipitor, Lyrica, Meloxicam, and Tramadol. (Tr. 472).

In October 2010, Kashif A. Mufti, M.D., a rheumatologist, examined Burt and determined that his presentation of diffuse arthralgias and myalgias with trouble sleeping at night and multiple tender points was consistent with fibromyalgia. His

---

[2] "'Rule out' in a medical record means that the disorder is suspected, but not confirmed—i.e., there is evidence that the criteria for a diagnosis may be met, but more information is needed in order to rule it out." *Byes v. Astrue*, 687 F.3d 913, 916 n.3 (8th Cir. 2012).

workup had been negative for autoimmune disease and/or inflammatory arthropathy. (Tr. 489). Dr. Mufti maximized Burt's Lyrica and Cymbalta and gave him a trial of amitriptyline. He was also given reading material about fibromyalgia and water aerobics. (Tr. 489). At about the same time, Burt was diagnosed with benign hypertension, which was controlled with medication. (Tr. 522).

In June 2011, Burt had a cystoscopy and urethral dilation and urethral catheter placement. (Tr. 575). He was instructed to self catheterize once each day to keep the strictured area open, but by July 2011 he told his primary care physician that he had stopped the catheterization because he did not understand what he was supposed to do. (Tr. 538). James Plate, M.D., stated that he spent 30 minutes trying to explain the reason for the catheterization, but Burt did not believe he could do the procedure. The urology clinic had also spent time trying to teach him. The urology clinic was going to send instructions to Dr. Plate's office, and they would offer further instructions. (Tr. 539).

On August 11, 2010, E. Dean Schroeder, Ed.D., conducted a consultative psychological examination for Nebraska Disability Determination Services. (Tr. 480-86). Schroeder reported that Burt was prompt for the appointment and able to drive to the examination site without difficulty. He had not bathed recently and had not shaved in several days. He was wearing a brace on each wrist and complained throughout the evaluation of discomfort from fibromyalgia. He also complained of discomfort from arthritis and from a digestive problem. He was, however, able to walk from the waiting area to the examination room and back without difficulty, indicating that his physical complaints apparently had not affected his mobility. (Tr. 482). His general orientation and understanding of the purpose of the interview was intact. His initial attitude was one

9

of openness and friendliness. He appeared to enjoy the interaction with the interviewer. (Tr. 482). Burt was friendly and talkative and fully engaged in the evaluation process. He did not appear to be suffering from any increased levels of stress or anxiety, but his mood appeared to be lowered. (Tr. 483).

Burt reported that he had not been employed since March 2010, when he was fired after working in food service for nine years at a local nursing home. (Tr. 483). He thought his job was terminated because he was one of the longer-term employees and his salary was somewhat higher than other employees. (Tr. 483).

Burt reported to Schroeder that he had been afflicted with fibromyalgia since he was in his early 20s. (Tr. 484). Burt reported that he experienced daily discomfort from his fibromyalgia, mostly in his core. He also complained of some difficulty with arthritis and believed that he may suffer from carpal tunnel syndrome. His sister, who is a mental health professional, and a physician had told him that he may suffer from bipolar disorder. Schroeder noted that Burt did not display any symptoms of manic behavior, nor did he admit to periods of increased activity, lack of sleep, lack of concentration and focus, or other symptoms that would be typical of a manic state. As a result, Schroeder stated that it appeared that Burt was more likely suffering from moderate levels of depression. (Tr. 484). Burt stated that his mood was significantly lowered when his fibromyalgia and arthritis discomfort increased. He also noted that his mood was related to some of the social contacts he had within the community, which Schroeder stated would again indicate the presence of depression rather than bipolar disorder. (Tr. 484).

Schroeder stated that Burt's ability to receive, organize, analyze, remember, and express information appropriately in a conversational setting was in the average to low-

average range. He had some difficulty staying on track throughout the interview, and on occasion his verbal production needed to be redirected to the question at hand. (Tr. 485). His affect was somewhat restricted, but he was able to display an appropriate range of emotional responses. There was no evidence of any special preoccupations or apparent disturbances in perception. Burt did not display any observable signs of tension, anxiety, or psychomotor disturbance. His judgment and insight were likely in the average to low-average range. He had been able to produce adaptive behavioral skills that were quite effective throughout his lifetime. (Tr. 485).

Schroeder noted that Burt did not report any restrictions of activities of daily living as they related to his mood disorder, but his physical discomfort was the most limiting aspect of his life at the time. (Tr. 486). Schroeder stated that Burt was fully capable of sustaining the concentration and attention needed for task completion. He was capable of understanding, remembering, and carrying out short and simple instructions under ordinary supervision. (Tr. 486). The diagnostic impression was mood disorder due to physical discomfort with depressive features. Schroeder indicated that Burt's current GAF[3] was 65 and in the past year, it had been 75.[4] (Tr. 486).

---

[3] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental-health illness.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n. 1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994)).

[4] "[A] GAF score of 65 [or 70] ... reflects 'some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning. . . but generally functioning pretty well, has some meaningful interpersonal relationships.'" *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010) (internal citations omitted). "A GAF between 71 and 80 indicates that '[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors. . .; no more than slight impairment in

Schroeder stated that Burt had no restriction in activities of daily living or difficulties in maintaining social functioning. (Tr. 480). Schroeder noted that Burt's depression might worsen when his physical discomfort increased. However, he had the ability to sustain concentration and attention needed for task completion, to understand and remember short and simple instructions under ordinary supervision, to relate appropriately to coworkers and supervisors, and to adapt to changes in the environment. Burt was capable of handling his own funds. (Tr. 480).

Burt first saw a psychiatrist on October 26, 2010. (Tr. 491-94). William J. Michael, M.D., noted that Burt showed high levels of anxiety during the initial interview, as well as a significant number of obsessive compulsive components. (Tr. 491). Burt did not report any auditory or visual hallucinations or delusions. (Tr. 491). Burt had never before seen a mental health professional, but he had taken Paxil, which he said made him feel numb. (Tr. 492). Dr. Michael stated that Burt was hyperverbal through most of the interview but he was fairly redirectable. His mood and affect were moderately anxious. Burt was alert to person, place and time. Dr. Michael assessed Burt as having provisional obsessive compulsive disorder (OCD) with a questionable paranoia component, anxiety, probable agoraphobia without panic attacks, rule out depression, and cannabis dependency. His GAF was 60. (Tr. 492). His medications were revised and Burt was encouraged to continue to utilize appropriate coping skills and positive support systems. (Tr. 493).

---

social, occupational, or school functioning.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n. 1 (2d Cir. 2008).

When Burt returned to Dr. Michael on December 1, 2010, Burt said he had been tolerating his medications and his nocturnal sleep was much improved. He had significantly fewer obsessions and compulsions and his anxiety was decreased. (Tr. 490). He was not hyperverbal and his thought process was goal directed. (Tr. 490). On February 2, 2011, Dr. Michael noted that Burt's mood and affect were moderately dysphoric. He was diagnosed with depressive disorder, anxiety disorder, and OCD, with a history of agoraphobia without panic attacks. (Tr. 589). On July 11, 2011, Dr. Michael reported that Burt was hyperverbal. His mood and affect were mild to moderately dysphoric with a mood congruent affect. His medications were continued. (Tr. 590).

On February 15, 2012, Dr. Michael noted that Burt reported he had started taking Seroquel and Cymbalta again, and he was less easily annoyed. He reported that he still had a significant amount of isolation, poor concentration, and tangentiality. Burt reported that at times he lay in bed all day due to his mood and his fibromyalgia. (Tr. 594). His mood and affect were mildly dysphoric with a mood congruent affect. His speech was hyperverbal and overinclusive. He was diagnosed as bipolar affective disorder, agoraphobia without panic attacks, and a history of anxiety disorder. Burt's medications were continued. Dr. Michael stated that at the time and in the foreseeable future, he did not think Burt was able to obtain gainful employment due to chronic and persistent mental illness, i.e., bipolar affective disorder. He highly encouraged Burt to continue to use appropriate coping skills and positive support systems to include less isolative behavior. (Tr. 594).

On May 16, 2012, Burt returned to Dr. Michael. (Tr. 619). His mood and affect were moderately dysphoric with a mood-congruent affect. His thought process was

13

slightly overinclusive but redirectable. Dr. Michael talked with Burt about continuing to use a positive support system and appropriate coping skills about his most recent disability hearing. Although he had missed an appointment with a pain clinic, Burt was receptive to rescheduling. (Tr. 619).

## B.    Medical Opinion Evidence

Both physical and mental health reports from experts were received into evidence. On August 5, 2010, Laouel Kader, M.D., completed a physical disability examination. (Tr. 476). Dr. Kader found that Burt was in no acute distress and was alert, oriented, and cooperative. (Tr. 476). He had no difficulty with station and gait for ambulation and had no difficulty getting on or off the examination table. (Tr. 476). His physical examination was positive for mild limitation in the shoulder. The last time he had seen a specialist for fibromyalgia was more than five years earlier. Dr. Kader noted that Burt was taking medication for fibromyalgia, but the medications were not at optimal doses. Burt needed proper evaluation and treatment at the optimal range of medication, including the use of narcotics. Dr. Kader said there was no basis for disability. (Tr. 477).

Jerry Reed, M.D., completed a physical RFC assessment on August 18, 2010. (Tr. 396-403). Dr. Reed stated that Burt could occasionally lift and/or carry 50 pounds and could frequently lift and/or carry 25 pounds. (Tr. 397). He could stand, walk, or sit for six hours in an eight-hour workday. He was unlimited in his ability to push and/or pull. (Tr. 397). Burt had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 398-400).

Dr. Reed stated that there were several inconsistencies between the claimant, the third party, and the medical evidence. Burt stated that his body was numb and that

14

he had sharp tingling pain, but at the clinical evaluation he was able to ambulate without difficulty and had good range of motion. Burt's sister stated that he was isolated and homebound, but he reported that he ran errands every day and went to the laundromat several blocks away. Burt reported that he could only sit for 30 to 60 minutes and stand for one hour, but he also reported that he watched television most of the day and went to the laundromat. Due to the inconsistencies, Dr. Reed found Burt to be partially credible. (Tr. 401).

Dr. Reed noted that it appeared Burt had a history of fibromyalgia and carpal tunnel symptoms. He was wearing braces on his wrists. However, there were no noted fibromyalgia trigger points in his medical evidence. In addition, he had no tenderness noted in the current evaluation and he had full range of motion of all extremities with the exception of some mild limitation in his shoulder abduction. Burt had some degenerative changes in his lumbar spine but that had not affected his mobility. (Tr. 403). Although Burt and his sister reported that he was severely limited in his mobility and activities of daily living, there was no medical evidence that supported those limitations. (Tr. 403).

On December 30, 2010, Steven Higgins, M.D., affirmed Reed's RFC. (Tr. 405). Dr. Higgins noted that additional evidence on reconsideration included Burt's visit with Dr. Mufti, a rheumatologist, on October 25, 2010. Burt continued to have arthralgias with mild degenerative disc disease of the lumbar spine. His exam showed no active synovitis, good grip strength, good range of motion of the joints, and mild diffuse tenderness and tender/trigger points. Prior testing for autoimmune disease was negative. (Tr. 405).

Linda Schmechel, Ph.D., who completed a psychiatric review technique on August 18, 2010, determined that Burt had a non-severe affective disorder. (Tr. 361). She stated that he had a mood disorder due to physical discomfort with depressive features. (Tr. 364). Schmechel stated that Burt had no restriction of activities of daily living and no difficulties in maintaining social functioning, or in maintaining concentration, persistence, or pace. He had no repeated episodes of decompensation. (Tr. 371). Schmechel noted that Burt alleged his disability was due to bipolar disorder and physical health problems, including fibromyalgia, pain and numbness in arms and joints, and carpal tunnel in both wrists. (Tr. 373). Burt reported that he had concentration issues and slow and confused thinking, but he was able to run errands and interact in the community. Burt had not had any psychological treatment or counseling. (Tr. 373). Schmechel noted that Burt had worked for 10 years and was let go, but it was not because of his mental health. Schmechel stated it appeared that Burt had no limitations in regards to his mental health. (Tr. 373).

Jennifer Bruning Brown, Ph.D., completed a mental RFC assessment on December 30, 2010. (Tr. 376). She found no significant limitations in Burt's understanding and memory and he had an above average fund of knowledge and intellect. (Tr. 378).  He had no limitations in sustained concentration and persistence, except that he had moderate limitations in the ability to work in coordination with or proximity to others without being distracted by them. (Tr. 376). Burt had no limitations in the ability to ask simple questions or request assistance, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness. He

16

had moderate limitations in the ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. Brown noted that Burt was isolative and had some anxiety and obsessive-compulsive disorder. (Tr. 377-78). Burt had no limitations in adaptation, including the ability to respond appropriately to changes in the work setting, to travel or use public transportation, and to set realistic goals or make plans independently of others. (Tr. 377).

In a psychiatric review technique, Brown stated that Burt had a mood disorder, OCD, anxiety disorder, not otherwise specified, agoraphobia, panic attacks, and cannabis dependency. (Tr. 384, 386, 389). Brown indicated that Burt had mild restriction of activities of daily living and difficulties in maintaining concentration, persistence, or pace. (Tr. 391). He had moderate difficulties in maintaining social functioning, but no episodes of decompensation. (Tr. 391). She had reviewed additional evidence from Burt's visits to Dr. Michael in October and December 2010. Burt was doing better, was tolerating his medications, and showed a less anxious mood. He had much less psychomotor agitation, and he was not hyperverbal. His insight and judgment were improved. His cognition was still intact, and he had no racing thoughts. Brown determined that Burt had a severe impairment, but no listings were met or equaled. His anxiety disorders imposed some moderate restrictions in the area of social functioning, but no marked restrictions were found. Burt's statements were deemed partially credible. (Tr. 393).

Dr. Michael completed a medical source statement (mental) on September 6, 2011. (Tr. 591). He stated that Burt had mild limitations in the ability to understand,

17

remember, and carry out simple instructions, and the ability to make judgments on simple work-related decisions. He had moderate limitations on the ability to understand, remember, and carry out complex instructions and the ability to make judgments on complex work-related decisions. (Tr. 591). Burt had racing thoughts and obsessions, a moderately dysphoric mood, and "blank" cognition feeling. (Tr. 591). Burt had no limitations in the ability to interact appropriately with the public, supervisors, and co-workers, and mild limitations in the ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 592).

On September 27, 2011, Robert E. Pelc, Ph.D., completed a psychiatric review technique. (Tr. 542). Pelc stated that Burt had a mood disorder, anxiety-related disorders including OCD and agoraphobia, and marijuana abuse disorder. (Tr. 542). Pelc stated that Burt had mild limitations in restriction of activities of daily living and in maintaining concentration, persistence, or pace. (Tr. 552). He had moderate difficulties in maintaining social functioning. (Tr. 552). Burt had no episodes of decompensation. (Tr. 552). In a medical source statement of the ability to do work-related activities (mental), Pelc stated that Burt was able to understand, remember, and carry out simple instructions and the ability to make judgments on simple work-related decisions. He had mild limitations in the ability to understand, remember and carry out complex instructions, and the ability to make judgments on complex work-related decisions. (Tr. 556). Burt had mild limitations in the ability to interact appropriately with supervisors and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 557). He had moderate limitations in the ability to interact appropriately with the public. (Tr. 557).

18

On March 24, 2012, Dr. Michael completed a second medical source statement (mental). (Tr. 596). He stated that Burt had moderate limitations in the ability to understand, remember, and carry out simple instructions. He had marked limitations in the ability to make judgments on simple work-related decisions. Burt had extreme limitations in the ability to understand, remember, and carry out complex instructions, as well as the ability to make judgments on complex work-related decisions. (Tr. 596). Burt had racing thoughts with obsession, a moderately dysphoric mood, poor concentration, and isolative behavior. (Tr. 596). Burt had marked limitations in the ability to interact appropriately with the public and extreme limitations in the ability to interact appropriately with supervisors and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 597).

On April 22, 2012, Thomas E. Atkin, Psy.D., completed a medical source statement (mental). (Tr. 599). He stated that Burt had no limitations in the ability to understand, remember, and carry out simple instructions and the ability to make judgments on simple work-related decisions. He had mild limitations on the ability to understand, remember, and carry out complex instructions and to make judgments on complex work-related decisions. (Tr. 599). He had moderate limitations on the ability to interact appropriately with the public. He had mild limitations on the ability to interact appropriately with supervisors and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 600). Atkin noted that Burt used cannabis on a regular basis and that the limitations were based on the presence of that abuse. (Tr. 600).

19

Atkin also completed a psychiatric review technique in which he stated that Burt had affective, anxiety-related, and substance addiction disorders. (Tr. 602). Atkin stated that Burt had mild restriction in activities of daily living and difficulties in maintaining concentration, persistence, or pace. He had moderate difficulties in maintaining social functioning and no episodes of decompensation. (Tr. 612). Atkin did not give weight to Dr. Michael's medical source statement of March 2012, which was completed six months after the first statement and suggested that Burt had significant limitations. Such alleged limitations were not supported in Dr. Michael's treatment records, which did not document any limitations secondary to mental health issues. (Tr. 614). At the hearing, Atkin stated that a person with limitations as severe as those identified in Dr. Michael's second statement would require institutionalization. (Tr. 73).

On June 1, 2012, Dr. Michael wrote a letter to address the reasons for the differences between his opinions on September 6, 2011, and March 22, 2012. (Tr. 617). Dr. Michael stated that the disparities hinged on Burt's isolation behavior, poor concentration, and tangentiality. The mental health issues had a definite correlation with fibromyalgia, which was documented in Dr. Michael's progress note of February 15, 2012. The same progress note reported that Burt's speech was hyperverbal and overinclusive, which showed a significant decline from the progress note of October 12, 2011. (Tr. 617). Burt's behavior at the October 12, 2011, appointment showed a decline compared to the progress note of July 11, 2011. Dr. Michael disagreed with Atkin's statement that Burt should be institutionalized if his impairments were as severe as indicated in Dr. Michael's second opinion. Dr. Michael stated that institutionalization would be based on suicidality, homocidality, and acute psychotic features. (Tr. 618).

20

C.      **Hearing Evidence**

At the first hearing on October 17, 2011, Pelc testified that, as a medical expert, he had reviewed the medical records through July 25, 2011. (Tr. 38). Pelc stated that Burt had a mood disorder, anxiety not otherwise specified, OCD with no panic attacks but some agoraphobic features, depression not otherwise specified, and substance abuse. (Tr. 40). Pelc said the limitations he had identified in the psychiatric review technique were consistent with mild limitations, primarily as a result of a relatively high GAF score at or above 60. (Tr. 41-42). Burt had few limitations in activities of daily living. In the area of social functioning, Burt had moderate limitations. He was maintaining friendships, was able to communicate and cooperate, and had some anxieties about being in a public setting but otherwise he adequately interacted socially. (Tr. 42). Pelc stated he did not have the benefit of a recent mental status examination, but he assumed it showed mild limitations, although Burt might have moderate limitations for more complex information processing. (Tr. 42). He would be able to carry out three- and four-step operations. (Tr. 43).

Burt testified that he went to college for 1½ years. (Tr. 44). For the past 15 years, he had worked as a cook. (Tr. 46). He stated that his medications caused confused and segmented thinking. He developed tinnitus after taking Lyrica, and Seroquel made it difficult for him to wake up. (Tr. 47). Burt stated that fibromyalgia caused his body to hurt. It was generally in his shoulders, the back of his neck and head, and lower back. (Tr. 48). He had osteoarthritis that affected every joint, especially his ankles. (Tr. 48). Burt stated that he had carpal tunnel syndrome in both arms and that he wore a brace on his left wrist. He did not wear a brace on his right arm because it impaired his ability

21

to move. (Tr. 49). He testified that he dropped things like milk cartons because of the problems with his wrists. (Tr. 50). Burt said he has to catheterize himself every day, which he had difficulty with because of his wrists. (Tr. 51). He said he had headaches every day. (Tr. 52). Burt stated he had sudden bursts of anger. (Tr. 53). He had sinusitis year-round. (Tr. 53). He said he suffered from fatigue and woke up tired. (Tr. 54). Burt said he had about four hours a day when he was able to think and where his body moved as it should. (Tr. 54). Burt said he could stand in one position for 10 to 30 minutes. (Tr. 55). He could walk around the block but it would take a while. (Tr. 56). He said he could sit for an hour at the most. (Tr. 57). Burt said he bought milk by the pint or quart because a gallon is too heavy. (Tr. 57). He could carry a couple of pounds. (Tr. 58). Burt said his sleep patterns were not uniform. He might sleep three or four hours or he might sleep 16 to 18 hours. (Tr. 58). Burt said he showered two or three times a week and was able to shave, wash and comb his hair, and take care of himself. (Tr. 60). He cooked frozen or packaged meals. (Tr. 61).

At work, Burt said he could probably stand and walk for 45 minutes before needing to sit down. (Tr. 61). Burt said it took him a couple of hours to do laundry because "my head doesn't think." (Tr. 62). He was able to go to the grocery store and to visit a cousin. (Tr. 63). He watched television and read magazines or newspapers. (Tr. 63).

Jared Gravet, VE, testified that Burt's skills as a cook would transfer to light or sedentary work. (Tr. 64-65). He said Burt's past work would be available because it was a medium-duty job. (Tr. 66).

At a second hearing on April 26, 2012, Atkin testified that Burt had been diagnosed with depression not otherwise specified, mixed anxiety disorder, and cannabis dependence. (Tr. 68-72). Atkin said the evaluations by Schroeder and Dr. Michael indicated mild limitations. (Tr. 72). Treatment notes were consistent and showed appointments every six months for medication. (Tr. 72). Atkin stated that a medical source statement from Dr. Michael was consistent with no significant limitations. Atkin did not give weight to a second opinion from Dr. Michael, dated six months later, because it opined that Burt had significant limitations,. The limitations were not supported with treatment records. Atkin stated there were no significant limitations documented in the record secondary to Burt's mental health issues. (Tr. 72). The significant limitations indicated in Dr. Michael's second evaluation would have justified the person being institutionalized. (Tr. 73). Atkin stated that Burt would be able to understand, remember, and carry out four- or five-step instructions. (Tr. 73). Burt could have occasional contact with the public and frequent contact with others who were stable and with whom he was acclimated. (Tr. 73).

Burt testified that his physical conditions had not changed since the first hearing. (Tr. 76). He had been seeing Dr. Michael every three months. (Tr. 76). William J. Tysdal, VE , testified that a person with the restrictions and limitations set forth in Dr. Michael's second opinion would not be able to do any work. (Tr. 78-79). The ALJ asked a hypothetical question listing Burt's limitations, and Tysdal stated that the hypothetical individual would be able to work as a hand packager, which is of medium exertion and unskilled, with 50,000 jobs nationally and 700 in the region; as a small products assembler, which is light exertion and unskilled, with about 35,000 positions nationwide

23

and 340 in the region; or as a cleaner/housekeeping, which is light exertion and unskilled, with about 132,000 positions nationally and 2,600 in the region. (Tr. 80-81). Tysdal said if carpal tunnel pain and numbness reduced the ability to perform hand functions, all of the jobs he listed would be precluded for Burt. (Tr. 81-82).

## D.    Additional Evidence

Nora Treat, Burt's sister, completed a third-party function report on June 20, 2010. (Tr. 329-31). She stated she saw Burt occasionally because they lived 400 miles apart. She stated that Burt did not get out of bed until mid- to late afternoon because of his fatigue and body aches. She was concerned that he had bipolar disorder and suffered with severe anxiety and depression. Treat stated that neither Burt nor his roommate were very functional. Burt was mostly homebound and his muscle tone and strength were quite poor. He ate prepackaged foods. He took his laundry to a laundromat several blocks away and that wore him out. She stated that Burt could be very pleasant with others, but he could also be very inappropriate if he was anxious. She said he watched television and read the newspaper. Treat stated that Burt was very isolated and very poor. He did not participate in any activities. (Tr. 329). Burt was very clean in his grooming habits. (Tr. 330). Treat did not know how well Burt responded to supervision. (Tr. 330). She said Burt was able to concentrate and maintain attention unless he was really anxious. He moved very slowly. Treat stated that she had a master's degree in social work and was a licensed mental health professional. She believed Burt had major physical and mental health issues that greatly impacted his activities of daily living. The issues also made it very difficult for Burt to get and maintain

a job. She stated that she believed Burt had no other choice but to seek disability. (Tr. 331).

On June 28, 2010, Burt completed a daily activities and symptoms report. (Tr. 332-36). He stated that his body was in numbing, sharp, and tingling pain, and he showered only if he was comfortable standing. (Tr. 332). He mowed his own lawn and that of his parents. He could dress himself, but any activity took a while because of his stiffness, pain, and lethargy. He cleaned his house once a week in short periods of time. He maintained a very small garden. After mowing the lawn, he needed to rest for 30 to 60 minutes. He was able to drive a car and could make short trips in town, but he had not taken a long trip of more than 60 miles for 10 years. (Tr. 332). Burt stated he completed crossword puzzles. (Tr. 333). He shopped for groceries and went to the hardware store. He handled his own money. He no longer attended church and was not a member of any clubs. Burt said he typically slept a minimum of 10 hours a day and might sleep between 14 and 18 hours a day. He said he could walk a quarter of a mile in five minutes. He guessed he could stand for one hour and could sit for 30 to 60 minutes. (Tr. 333).

Burt said his symptoms were fatigue, pain, confused thought, stiffness, numbness, muscle pain, joint pain, tinnitus, weakness, dizziness, mental pressure, and paralysis-like symptoms 50 percent of the time when he awoke. (Tr. 334). He said he could function better when he got a lot of sleep. His pain was in his entire body and in all his joints. (Tr. 334). Burt stated his medications caused side effects like confused thinking, tiredness, and tinnitus. (Tr. 335).

### III.  STANDARD OF REVIEW

25

This court must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)). *See also Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted). *See also Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

This court must also determine whether the Commissioner's decision "is based on legal error." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (citations omitted). No deference is owed to the Commissioner's legal conclusions. *See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003). *See also Collins*,

*supra*, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.  ANALYSIS

**A.    Medical Expert Opinions**

Burt first argues that the ALJ erred in eliciting opinions from psychologists who had not reviewed disability and function reports or heard testimony. (Pl.'s Br. at 43-44). He argues that Pelc and Atkin could not competently opine as to Burt's ability to perform work and interact appropriately on a sustained basis. (Pl.'s Br. at 45).

Burt asserts that *Colhoff v. Colvin*, 2014 WL 1123518 (D.S.C. 2014), requires remand in this case because the psychologists did not review the "E" exhibits. In 20 C.F.R. § 404-1520(a), the regulations provide the factors that an ALJ is to consider in rating the degree of a claimant's functional limitation. The regulation refers to 12.00C through 12.00H of the Listing of Impairments in appendix 1. Listing 12.00E discusses factors the ALJ must consider "when assessing chronic mental impairments, including where a claimant may have structured his life in a way to minimize stress and reduce symptoms and signs." *Colhoff*, *supra* at *3. In *Colhoff*, the claimant argued that an expert "must of necessity consider disability and function reports (known as the "E" exhibits) and testimony of the claimant and witnesses." *Id.* at *4. The district court determined that the ALJ erred in relying on testimony of an expert who had failed to consider disability and function reports, statements by the claimant, and third-party statements.

In the case at bar, Pelc testified at the first hearing that he reviewed the medical exhibits. (Tr. 37-38). He also testified that the limitations he had cited were consistent

with the information contained in the records and the treatment records. (Tr. 41). Burt's counsel did not challenge Pelc's testimony. (Tr. 40). At the second hearing, Atkin testified that he had reviewed the medical exhibits, and Burt's attorney did not challenge Atkin's testimony. (Tr. 71).

There is nothing in the record to suggest that Pelc and Atkin did *not* review the disability and function reports. The experts stated that they reviewed medical exhibits, but there was no description of the evidence that was included in the medical exhibits. In Burt's brief, he states, "When a non-examining psychologist testifies as a medical expert and considers [Social Security regulations], the expert must of necessity consider disability and function reports . . . and testimony of the claimant." (Pl.'s Br. at 44). However, he offers no legal authority to support this assertion.

Burt's counsel had the opportunity to question both experts. (Tr. 43-44, 74). Counsel did not question the experts as to the source of their opinions. In addition, the ALJ did not rely solely on the opinions of Pelc and Atkin in assessing Burt's RFC. The ALJ must consider the record as a whole, and there is no support for Burt's argument that the ALJ improperly elicited the opinions of Pelc and Atkin.

## B.  Identification of Severe Impairments at Step Two

Burt objects to the ALJ's failure to identify carpal tunnel syndrome and bipolar disorder as severe impairments. (Pl.'s Br.  at 46). He argues that this failure negatively affected the ALJ's determination of Burt's RFC. (*Id.*).

The ALJ identified Burt's severe impairments as depression not otherwise specified, anxiety disorder, cannabis dependence, degenerative disc disease of the lumbar spine, obesity, and fibromyalgia. (Tr. 14). An impairment is severe if it

28

significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). Basic work activities include physical functions such as walking and standing, understanding, carrying out, and remembering simple instructions, and responding appropriately to supervision, co-workers, and usual work situations. 20 C.F.R. § 404.1521(b). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, and not only by the claimant's statement of symptoms. 20 C.F.R. § 404.1508. An impairment must have lasted or must be expected to last for a continuous period of at least 12 months. 20 C.F.R. § 404.1509.

The ALJ noted that Burt had self-diagnosed bipolar disorder and bilateral carpal tunnel syndrome. (Tr. 20). The medical records show that the only expert who stated that Burt had bipolar disorder was Dr. Michael. (Tr. 594). Schroeder stated that it was more likely that Burt had depression rather than bipolar disorder. (Tr. 484). Atkin stated that the bipolar disorder diagnosis of Dr. Michael should be analyzed in the same manner as depression. (Tr. 74). Burt's sister, who is a mental health professional, was concerned that Burt had bipolar disorder, but no evaluation was completed that supported a finding that Burt had bipolar disorder which rose to the level that it could be considered a severe impairment.

As for carpal tunnel syndrome, the ALJ found the impairment to be non-severe. Although Burt had been diagnosed with carpal tunnel syndrome in 1999, (tr. 449-50), the ALJ took into consideration that there were no electrodiagnostic studies completed during Burt's alleged period of disability. (Tr. 25). Burt complained of numbness that caused him to drop things, but this was not reflected in the medical records. (Tr. 24, 49).

29

The ALJ properly evaluated Burt's impairments at step two and found some to be severe and some to be non-severe. He used the limitations based on the impairments to formulate the RFC at step four. This allegation of error has no merit.

## C.  Failure to Consider Fibromyalgia with Mental Impairments

According to Burt, the ALJ erred in failing to consider the combined effect of fibromyalgia and his mental impairments. He cites 42 U.S.C. § 423(d)(2)(B), which provides that "the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process."

In finding that Burt had no impairment or combination of impairments that met or equaled the listed impairments, the ALJ noted that no treating or examining physician had mentioned findings equivalent in severity to the criteria of any listed impairment. The ALJ also considered the opinions of the medical consultants who reached the same conclusion. (Tr. 15). Schmechel did not find that the medical evidence established a severe mental impairment. (Tr. 15). She emphasized that Burt had not had any psychological treatment or counseling for mental health. He appeared in no distress, displayed no signs of anxiety or tension, and denied any manic behaviors. He had sustained a full-time job for more than 10 years and was not let go because of his mental health. (Tr. 15-16). Brown found Burt's statements were partially credible. (Tr. 16).

30

The ALJ found that Burt's mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, and therefore the paragraph B criteria were not satisfied. (Tr. 17). The ALJ noted that the medical records did not support any finding of a medical impairment affecting the musculoskeletal system. (Tr. 17-18). Functional loss for purposes of such an impairment includes an inability to ambulate effectively on a sustained basis for any reason. The ALJ found that Burt did not use any assistive device for ambulating and had no documented limitations of handling, fingering, or manipulation reflecting an impairment in fine and gross movements. There was no separate listing for fibromyalgia, but the ALJ considered it under the musculoskeletal system. (Tr. 18).

No treating or examining physician, except Dr. Michael, made any findings that Burt's impairments were equivalent in severity to the criteria of any listed impairment. (Tr. 15, 480, 482-86). Dr. Michael's opinion was not given credibility because it was inconsistent with his earlier opinion and with the medical records. The state agency medical consultants who evaluated Burt at the initial and reconsideration levels of the administrative review process also found no impairments that equaled the listed criteria. (Tr. 361-75, 376-95, 396-404, 405, 542-58, 599-615). The evidence supports the ALJ's finding that Burt's impairments did not meet or equal the requirements of any listed impairment.

### D.    Credibility Assessment

Burt argues that the ALJ's credibility assessment was not supported by the record. (Pl.'s Br. at 50). The ALJ found that Burt's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent they

31

were inconsistent with the ALJ's RFC assessment. (Tr. 24). The ALJ determined that Burt's allegations of disabling pain were not substantiated or corroborated by the medical records. He had alleged fibromyalgia and pain throughout his entire body for more than 25 years. Other than termination from his job, no precipitating or traumatic event occurred on or near his alleged onset date. Burt's symptoms were the same as they had always been and had not changed in the period between the two hearings. The examining physician, Dr. Kader, could not find any basis for disability. The rheumatologist, Dr. Mufti, did not find severe limitations. Burt did not seek psychiatric evaluation until seven months after his alleged onset date and he did not report being in therapy or counseling. (Tr. 24). Burt collected unemployment for more than one year, which indicated he was holding himself out as available for work during that period. (Tr. 25). The ALJ also noted that Burt had not been compliant with medications or treatment. (Tr. 24-25).

The duty of deciding questions of fact, including the credibility of a claimant's subjective testimony, rests with the Commissioner. *Gregg v. Barnhart*, 354 F.3d 710 (8th Cir. 2003). The crucial question is not whether a claimant experienced pain, but whether his credible subjective complaints prevent him from performing any type of work. *Id.* If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the court will normally defer to the ALJ's credibility determination. *Id.*

To analyze a claimant's subjective complaints, the ALJ considers the entire record including the medical records, statements by a third party and the claimant, and factors including the claimant's daily activities, the duration, frequency and intensity of pain, dosage, effectiveness, and side effects of medication, precipitating and

32

aggravating factors, and functional restrictions. *See* 20 C.F.R. §§ 404.1529, 416.929; *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

The ALJ found that no precipitating or traumatic event occurred on or near his alleged onset date. (Tr. 24). Burt had worked for a number of years when his symptoms were the same as those at the time of the hearings. Burt argued that the ALJ did not properly consider the pain he suffered with fibromyalgia. However, not every diagnosis of fibromyalgia warrants a finding that a claimant is disabled. "'While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability.'" *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011), *quoting Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996).

None of the medical sources provided any support for Burt's claim that he was disabled. A lack of significant restrictions imposed by treating physicians supports the ALJ's finding that Burt is not disabled. The lack of restrictions also supports the ALJ's finding as to Burt's credibility because such a lack is inconsistent with a claim of disability. The ALJ adequately articulated his reasons for assigning less credibility to Burt's complaints. Substantial evidence in the record supports the ALJ's finding.

## E.   Weight Given to Expert Opinion

Burt argues that the ALJ erred in failing to give sufficient weight to the opinion of the treating psychiatrist, Dr. Michael. (Pl.'s Br.  at 60-61). The ALJ determined that the second opinion offered by Dr. Michael was not supported in the record by objective findings, clinical testing, or contemporaneous treatment records. (Tr. 25). Dr. Michael had stated that, in a six-month period, Burt's restrictions went from mild and moderate

limitations to marked and extreme. Dr. Michael did not identify any reasons for the deterioration. Atkin stated that an individual with those limitations would be recommended to be institutionalized, but Burt was not in counseling or therapy and there was no evidence that Dr. Michael had recommended it. Instead, Dr. Michael was prescribing medications and seeing Burt every three months. (Tr. 25).

Burt had appointments with Dr. Michael only twice during the six months between his opinions. (Tr. 596-98). The Eighth Circuit Court of Appeals has held that an ALJ was warranted in discrediting some of the treating physician's opinions, in light of other inconsistent or contradictory evidence in the record. *Weber v. Apfel*, 164 F.3d 431 (8th Cir. 1999). At the second hearing, Burt himself testified that his limitations were unchanged from the first hearing. (Tr. 75-76). He had not asserted at the first hearing that he had such serious limitations.

"When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions." *Cantrell v. Apfel*, 231 F. 3d 1104, 1107 (8th Cir. 2000). The court stated that, generally, the report of a consulting physician who examined a claimant once does not constitute substantial evidence upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician. *Id.*, *citing Lanning v. Heckler*, 777 F.2d 1316, 1318 (8th Cir.1985). However, there are two exceptions.

An ALJ's decision to "discount or even disregard the opinion of a treating physician" will be upheld where other medical assessments "are supported by better or more thorough medical evidence," or "where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Cantrell v. Apfel*, *supra*

34

(internal citations omitted). The ALJ's rejection of Dr. Michael's March 2012 opinion was reasonable. The opinion that Burt had marked and extreme limitations was not supported by objective findings or the record as a whole.

## F.   Assessment of RFC

Burt next argues that the ALJ's assessment of Burt's RFC was inadequate. (Pl.'s Br.   at 62). Burt complains that the ALJ failed to provide a function-by-function assessment.

In *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011), the appellate court stated that an ALJ is not required to mechanically list and reject every possible limitation of a claimant. The court reviews the record to ensure that an ALJ has not disregarded evidence or ignored potential limitations.

The ALJ determined that Burt was capable of the full range of medium work, including jobs such as hand packager, which is medium unskilled, small products assembler, which is light and unskilled, and cleaner/housekeeper, which is light and unskilled. (Tr. 26-27). All of the jobs had a sufficient number of jobs in the nation and the region. (Tr. 27).

An ALJ has the duty, at step four, to formulate the claimant's RFC based on all the relevant, credible evidence of record, including medical records, observations of treating physicians and others, and an individual's own description of his limitations. *McKinney v. Apfel*, 228 f. 3d 860, 863 (8th Cir. 2000). The ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).

The ALJ considered Burt's limitations as identified in the record and formulated the RFC on the basis of those records. The ALJ evaluated the claimant's credibility and determined which impairments were severe and which were not severe. The RFC is supported by the record.

## G.   Potential Jobs Identified by ALJ

Burt argues that the jobs identified by the VE did not match the RFC as assessed by the ALJ. (Pl.'s Br. at 67).

The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). The Commissioner may satisfy this burden through the testimony of a VE. *See* 20 C.F.R. §§ 401.1566(e), 416.966(e).

The ALJ posed a hypothetical question to the VE based on all of Burt's limitations supported by the record, which included a person of Burt's age, education, and work experience. (Tr. 79-80). The VE stated that the hypothetical person could perform work in the unskilled medium labor market. (Tr. 79-80). There is nothing in the record to suggest that the jobs listed by the VE required skills beyond those included in Burt's RFC. The hypothetical question included the impairments found to be credible, and the VE 's testimony was substantial evidence in support of the ALJ's determination.

## V.  CONCLUSION

For the reasons discussed, the court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

IT IS ORDERED:

1.    The Commissioner's decision is affirmed;

2.    The appeal is denied; and

3.    Judgment in favor of the defendant will be entered in a separate
document.

Dated this 11th day of June, 2014

BY THE COURT:


s/Laurie Smith Camp
Chief United States District Judge